# EXHIBIT B

EXPERT OPINION REPORT

———

INCIDENT ON DECEMBER 19, 2019

———

GRAJEDA

V.

OKEMO MOUNTAIN RESORT

Dick Penniman
11539 Lockwood Drive
Truckee, California
96161

OCTOBER 13, 2021

Law Offices of Smiley and Smiley, LLP
122 East 42nd Street, 39th Floor
New York, New York 10168

## 1.0 Introduction

The opinions expressed in this report are based on my incident site inspection, on my education, training and experience, and from the information contained in documents which were provided to me by the offices of Smiley and Smiley, LLP.

## 2.0 Documentation

1. Examination Before Trial Transcripts and/or Zoom video recordings and deposition exhibits for the following witnesses:
    Kyle Kostura (July 14, 2021)
    Ben Partridge (July 14, 2021)
    Chelsea Manley (July 14, 2021)
    Chris Lancaster (July 21, 2021)
    Elizabeth Gilman (February 25, 2021, March 11, 2021)
    Richard ("Ric") Grajeda (May 11, 2021, July 22, 2021, August 18, 2021)
    Kyle Cotter (August 19, 2021)
    Dan Cotter (August 19, 2021)
    Tom Breitenstein, (August 19, 2021)
    David Villani (August 27, 2021)
    Andrew Kilada (August 25, 2021)
    Joe Breitenstein (August 27, 2021)
    Joe Jansen (August 27, 2021)
    Michael Morabito (September 16, 2021)
    Ray Kennedy (September 16, 2021)
    Mary Mancino (September 24, 2021)
    Everett Moore (September 24, 2021)

2. Discovery Productions from Vail/Okemo, including Initial Disclosures dated February 19, 2021 and June 3, 2021, containing the incident report, witness cards/statements, photos, snow report, marking/padding guidelines, prior incidents, risk resource guide, etc.

    3. Accident re-creation photographs showing what the padding looked like when Ric slid under it and what it looked like when Ric was against the steel stand-pipe after the pad was removed (based upon the testimony of Kyle Cotter, Andrew Kilada and David Villani).

    4. Other personal documents named in the body of the report

### 3.0 The Incident

It is my understanding from the discovery documents that Ric Grajeda's injuries occurred at the Okemo Resort on December 19, 2019 while he was skiing on the Lower Mountain Road trail. When trying to make a right turn, his left ski slipped out on an icy snow surface patch. He fell, slid into a depression under a Gilman TS-2 shield next to a steel, snowmaking stand-pipe, and impacted the pipe with his back. The collision caused severe spinal injuries to Mr. Grajeda rendering him paraplegic.

### 4.0 Facts and Assumptions

1. From my investigation of the incident site, it appears that the natural terrain through which the Open Slope and Lower Mountain Road trails run was once a mixed evergreen and deciduous forest. In its natural state, the terrain would not be suitable for commercial, recreational skiing and snowboarding.

2. Observations from my site inspection of the Open Slope and Lower Mountain Road trails revealed that the incident area is a man-made environment having been created by clearing-cutting and removing all of the natural vegetation and debris. Natural terrain surface features had been graded and changed on these trails so as to create various standard trail design elements for commercial, recreational skiing and snowboarding.

3. One such element is an apparent drop-off of the terrain between the Open Slope trail and the Lower Mountain Road trail. The average slope angle of the Lower Mountain Road trail is less than that of the Open Slope trail creating a drop off area at various points between the two. There were also numerous snowmaking "stations" installed between the two trails. Other than the snowmaking stations, there were no other fixed obstacles on either trail in the area of the incident. The two trails together form a single, very large, wide-open area with slope angles suitable for lower level skiers and riders. The snowmaking stations effectively ran directly up the middle of the combined trail area.

4. At the time of the incident and my site inspection, the snowmaking stations consisted of fixed, steel water and air stand-pipe hydrants projecting out of the snow where buried supply pipes run underground up the slope. The steel hydrant stand-pipes that rise up from these supply pipes are approximately 4" in diameter. During my investigation and evident in the photographs I have seen taken on and around the day of the incident, I noted that the stand-pipes were fitted with Gilman TS-2 shields and other Gilman shield devices. The TS-2 shields are hollow cylinders of rolled, black, "Surlyn" closed-cell foam sheet-stock bolted together with U-bolts in clusters of two and covered with a single flat sheet of blue sheet-stock. At the time of the incident, the TS-2 shields were affixed to the standing pipes with two 12' webbing straps with plastic snap-together plastic buckles. It was noted from the deposition of several Okemo employees that the two mounting straps were buckled together creating a single strap criss-crossed in the back. It was noted at the time of the incident that one of the plastic buckles was broken. This would render the combined strap configuration ineffective at holding the shield against the stand-pipe. There was also a gap between the snow surface and the bottom of the shield at the time of Ric's collision with the stand-pipe. The shield fell off when Ric slid under the shield as he collided directly with the steel stand-pipe.

5. Proper installation of the TS-2 shields per the Gilman Corporation, the Vail Resorts own guidelines, and the standard custom and practice of the North American mountain resort industry requires that the base of the shield be flush to the snow surface with no gaps large enough for a person to slip under. Vail Resorts guidelines specifically require that snow gun padding be placed "facing up hill/fall line, sitting ON snow, clear of ice and snow." Proper installation also requires that the shields be affixed with two separate straps at the top and bottom so that if one strap fails, the other acts as a back-up. In addition, the cylinders must be hollow with no compacted snow or interior spacers that would prevent the tubes from having an effective crush zone (zone of deceleration) as the cylinders compress on impact. It was noted by Elizabeth Gilman in her deposition testimony from March 11, 2021 that photographs from Okemo's investigation report showed one or both of the cylinders of the subject TS-2 shield had a spacer(s) inside. I agree with Ms. Gilman's testimony that placing a spacer inside the component cylinder would have a detrimental effect on the ability of the component cylinder to compress the crumple zone as it is designed to minimize injury upon impact. To date, no known or documented information has been forthcoming from any source to suggest that there has ever been a serious, life-altering injury to any person impacting a properly installed and configured Gilman TS-2 shield. Indeed, Elizabeth Gilman testified at her deposition on February 25, 2021 that she is not aware of any skier having ever

sustained a serious injury when striking a properly installed Gilman Tower Shield product.

6. On the day of Ric Grajeda's incident, the Open Slope and Lower Mountain Road trails were rated as "easiest" trails. The snow surface conditions in this area were reported by Okemo to be "packed powder". Air temperatures at the base were report as +3° F at the base and -3° F at the top of the mountain. Wind speeds were report to be 15-25 mph.  According to the Princeton Wind Chill Table, with a temperature of +5° F and a wind speed of 15-25 mph, the temperature equivalent would be -25° F to -30° F. Witnesses, including Ric Grajeda and the friends accompanying him reported air temperatures to be "very cold" and "bone chilling" because of the wind chill factor. Snow surface conditions on the Lower Mountain Road and Open Slope trails were described by them as hard pack with icy patches.

7. In his deposition Ric states that he was skiing on the Lower Mountain Road trail just prior to his accident. The accident occurred on his second run down. From all of the descriptions in the evidence I have reviewed to date, Ric seems to have been skiing responsibly and in the normal and expected pattern of the trail just prior to his fall. In his deposition Ric stated that the cause of his fall was as follows: As he was attempting to turn right after veering left to avoid what he perceived was a ski school class of young children, his left ski slipped out on an unseen icy patch. His fall resulted in a slide which caused him to slip under the TS-2 shield and hit one of the exposed steel stand-pipes at a snowmaking station.

8. In his deposition, Ric stated that he was a beginner skier, and prior to his collision with the steel stand-pipe, he was not aware of the snowmaking stations on the Lower Mountain Road and Open Slope trails. This is normal for beginners. Beginner and lower skill-level skiers and riders, by definition have limited control of their speed and direction. It is the standard custom and practice in the mountain resort industry to remove all fixed obstacles from beginner and lower skill-level trails, or if that is not possible, thoroughly eliminate the potential of a direct impact with the fixed objects by padding, shielding or fencing the objects. Their powers of observations are normally limited to their immediate surroundings; usually only a few feet in front and even less to the side. A common adage in the mountain resort industry is, "If it is there, beginners will hit it." It is apparent that Okemo management was also aware of this fact. Chris Lancaster, ski-patrol director for Okemo, testified that it was foreseeable that a beginner skier could fall and slide into a snow-making gun on a beginner trail.  Only in the beginner and base areas of the resort did Okemo choose to install Gilman shields on fixed objects. These shields have proven to be one of the most effective impact mitigation devices on the

market. On the rest of the resort trails that I observed, snowmaking structures were installed to the sides off the trails. Thinner, less effective open cell foam padding was used on these snowmaking devices and elsewhere on the more advanced skill-level trails that I observed.

9. Safety hierarchies have evolved within the safety engineering and standards communities to prioritize hazard and risk mitigation measures in order of their proven and/or presumed effectiveness. One safety hierarchy that combines many of these priorities was published by peer review by Barnett and Brickman in the <u>Journal of Safety Research</u> in 1986, and it describes one of the most widely accepted. The first three priorities in this hierarchy are as follows:

<u>Safety Hierarchy, Barnett and Brickman,</u> Journal of Safety Research 1986

> First Priority: Eliminate the hazard and/or risk
> Second Priority: Apply safeguarding technology
> Third Priority: Install warning signs and markers

The "First Priority" category implies the design and construction of the Open Slope and Lower Mountain Road trails so as to eliminate any unnecessary hazards directly in the fall line including the steel stand-pipes at the snowmaking stations. This is especially necessary on slopes and trails intended for beginner and lower skill level skiers and riders. Where removal of such fixed objects is not practical and/or where the Open Slope and Lower Mountain Road trails could not be designed to avoid such hazards, the "Second Priority" category suggests the use of impact mitigation devices such as padding, shielding, and barriers (ie., catch fences and snow berms) be employed. If warning of the snowmaking pipes is also required, the "Third Priority" suggests the use of brightly colored signs and markers to call attention to the potential danger.

10. In 2019 and well before, safety standards existed for applying the principles of the "Safety Hierarchy" in the mountain resort industry as well as other industries throughout the world. As defined in <u>The Dictionary of Terms Used in the Safety Profession, Third Edition</u> by Richard W. Lack, P.E., CSP, RSP (UK), Editor (1988), the term "safety standard" is a "set of criteria specifically designed to define safe products, training, mechanisms, arrangements, processes, or environments, produced by a body representative of all concerned interests." These "safety standards" normally reflect a level or grade of quality or attainment regarded as a goal or measure of adequacy and are based upon "currently available scientific and empirical knowledge concerning the subject or scope of the standard." Such "safety

standards" were clearly established in the North American mountain resort industry and available to the industry in 1980, well before Ric Grajeda's incident. Up until 1979, the Ski Safety Committee of the National Ski Areas Association (NSAA) in the U.S. had gathered information relating to lift tower protective devices. In 1979 an ad hoc Committee on Tower Protection Devices, whose members were mostly from the former NSAA Ski Safety Committee was formed under the F8-14 Committee of the American Society for Testing and Materials (ASTM). Based on the scientific and empirical information gathered by the ASTM Committee, "safety standards" as defined above were set forth in a formal report in March of 1980. The report was known and available to the NSAA and the North American mountain resort industry in 2019. It included the scientific and empirical data collected to date and clearly indicated that the risks of severe injuries from collisions with rigid, man-made structures on any ski trail were unacceptable. The report stated that even small rigid structures such as "four-inch by four-inch pole supports were too strong and would not give [on impact] without causing injury."

11. Several alternative padding, shielding, and/or barrier devices and systems which complied with the definitions and concepts for safety standards described above, and which were widely available and used throughout the North American mountain resort industry in 2019, would have completely eliminated the risk of serious skier injury from impact with the snowmaking stand-pipe on the Open Slope and Lower Mountain Road trails in December 19, 2019. Examples of padding include hay or straw bales (in waterproof bags), several layers of open cell foam pads, and impact bags such as the "Willy Bag" available from most mountain resort suppliers. Examples of screening materials include International Ski Federation (F.I.S.) approved catch fences, Gilman "sheet fencing", and "triangle nets". All were available from various mountain resort industry suppliers. Included amongst these devices are the various Gilman "Tower Shields" which Okemo management chose to use to guard against impact with the snowmaking stand-pipes on the Open Slope and Lower Mountain Road trails. Proper installation was essential for the Gilman shields to prove effective, however.

12. Available crash-test data proves that well before 2019 most severe injuries from skier impacts with man-made objects at mountain resorts could have been eliminated or significantly reduced using readily available and affordable impact mitigating pads, shields, or barriers. Laboratory crash tests conducted in California by Dr. Carley Ward in October of 1999 and in which I assisted confirmed that catch fences, Gilman shield products, and even hay bales when properly installed would have acted to decelerate Ric Grajeda at a rate that reduced impact forces to acceptable levels for the human body. It was well known to members of the

Association of Ski Defense Attorneys (ASDA) and to the North American mountain resort industry that such impact mitigating devices did reduce the risk of injury from collision. Results of drop tests of Gilman products conducted by E.I. DuPont de Nemours, Inc. in 1984, and the anecdotal evidence from testimonials of mountain resort managers collected by the Gilman Corporation that attest to the effectiveness of the Gilman tower and post shield products were available and well distributed throughout the North American mountain resort industry in 2019. It has also been my experience (and was in 2019) that impacts with Gilman products and hay or straw bales do not cause significant injuries to skiers. Records of collision and impact injuries at member resorts have been collected by the National Ski Areas Association (NSAA) for decades. To confirm my experience and the testing and the anecdotal evidence collected by Dr. Ward and the Gilman Corporation, I am on record with a standing request in numerous depositions for members of the ASDA to produce any and all NSAA reports of incidents and injuries involving properly installed safety fences, hay or straw bales, or Gilman shields. To date not a single report has been forthcoming to suggest that any injury, let alone a severe injury, has involved any of these properly installed impact-mitigation devices. On the other hand, numerous instances of severe injuries have been documented and produced which involved unprotected or under-protected man-made structures where insufficient thickness or ineffective construction, installation, and/or maintenance of pads, shields, or barriers (or none at all) were applied. Ric Grajeda's accident is another such instance.

13. Skiing and snowboarding are considered "gravity sports". As such, gravity is the "motor" that powers the activity. Gravity is directional and pulls directly down a slope. This direction is called the "fall line", and it is always perpendicular to the horizontal contour of the slope. In skiing and snowboarding, the act of turning serves to direct the person to the right or left of the fall line, thereby allowing for control of speed and direction. Should a skier or snowboarder lose the ability to turn, gravity inevitably will pull him/her directly down the fall line. The ability to regain control may be difficult or impossible depending on the steepness of the slope, the snow surface texture and the skill of the skier or rider. In a fall on hard snow surfaces or ice the person also will likely continue to slide rapidly down the fall line until slowed or stopped by a collision with an obstacle or the slope levels out and the person slows to a stop naturally.

14. In building and maintaining ski and snowboard trails, mountain resort planners are aware that inevitably, the snow surface will have irregularities. Inevitably too, customers will lose control or slide in the direction of the fall line. With that knowledge, it is widely accepted in the North American mountain resort industry

(and is common sense) that creating man-made structures in the fall line of beginner and lower skill-level trails and slopes should be avoided unless there is a substantially level or low angle slope far enough above the structure to allow out-of-control or sliding customers to slow to a near stop before reaching fixed objects. Icy patches in an otherwise edgeable snow surface make it very difficult to consistently control speed and direction for any skier or rider at any skill level.

15. At mountain resorts, if placing man-made structures in the fall line of beginner or lower skill-level trails is unavoidable, the North American mountain resort industry standard custom and practice to reduce the risk of impact is to use effective impact mitigation devices such as pads, shields, and/or barriers. In none of the depositions of the Okemo personnel was this fact disputed. It was acknowledged that if the TS-2 shield had a gap at the bottom such that a person could slide under, that at the time of Ric Grajeda's collision it would have done little or nothing to mitigate the injurious forces of a sliding skier. At the time of the accident there was an unobstructed path from the top of the Lower Mountain Road and Open Slope trails all the way to most, if not all of the snowmaking stations whereby a fallen or sliding customer would have nothing to impede his/her course directly into them. Hard pack and icy snow surface conditions would increase the potential speed substantially just before impact.

16. As defined by the Webster's New World Dictionary (College Edition), the "inherent" risks of any activity or thing are those which are "integral to and inseparable from" that activity or thing. "Inherent" risks in recreational skiing and snowboarding include injuries from simple falls. These are falls that happen as a result of one losing one's balance or from making a minor technical error. Simple falls are a part of recreational skiing and snowboarding, and anyone at any ability level on any trail eventually will simply fall and slide. Falling does not necessarily imply a loss of control. A skier or snowboarder may be in complete control up to the moment of the fall, and in fact, may fall in a controlled manner. The risks of injury from a simple fall are a) the twisting moments of the fall (except those designed to be prevented by release bindings) and/or b) impacting the snow surface.

17. Certain risks of collision with objects and people may also be considered "inherent" to recreational skiing and snowboarding. But not all are. By definition, the removal of some "inherent" risks of collision (such as some trees, for example) would actually detract from and degrade the essential nature of skiing and snowboarding. While sign posts and snowmaking pipes may be viewed occasionally as necessary to the operation of commercial mountain resorts, the risks of severe injury they present to recreational skiers and snowboarders are not acceptable from

the standpoint of public safety. As described above, readily available pads, shields, and/or barriers can mitigate or remove the risks of severe injury from impact. To the contrary, placing unprotected or improperly protected snowmaking stand-pipes in the fall line of beginner and lower skill-level trails and slopes creates undesirable conditions that actually detract from and degrade the essential nature of recreational skiing and snowboarding. By definition such conditions are "extrinsic" risks in recreational skiing and snowboarding and demand that the condition be corrected or impact mitigation be properly installed to protect fallen, sliding customers from potential severe injury caused by such risks.

18. It is my experience that customers at recreational, mountain resorts expect reasonable and practical measures to be taken by the resorts to eliminate or adequately minimize unnecessary and extrinsic risks. Customers are not asked to examine man-made structures to determine the risk of severe injury they present, nor are they expected to do so. When a padding device is placed on an object, the customer rightly assumes that the device will serve the function it appears to serve. Installing a device that looks like a pad, but does not serve that function is clearly deceptive creating a false impression and a false sense of security. In addition, the impact mitigation device may partially or completely hide the object, obscuring the nature of what is being guarded. What may appear at a glance to be a stick poking up through the snow may, in fact, be an immovable steel pipe.

19. In my experience, most recreational skiers and snowboarders have little or no knowledge of, and in fact, have no reason to become familiar with construction methods and materials used on or near trails at mountain resorts. Nor are they familiar with the safety products and technologies available and in use to mitigate the risk of severe injury from collisions with extrinsic hazards on or near trails. It is my experience that most customers are "on vacation" and simply assume that adequate safety devices and signs are in place. They also assume that "flesh friendly" materials are used wherever practical. Most simply try to avoid fixed objects and take little notice of their composition or of the adequacy of pads, shields, or barriers that appear to be installed for their protection. In my experience, most people take little if any notice of unprotected or under protected, man-made objects that could cause severe injury with even minor contact until it is brought to their attention through such tragedies as befell Ric Grajeda.

20. The simple fact that man-made objects may be "visible" does not justify failure to use properly installed safety technologies to mitigate the potential for impact injury from collisions with those objects. They must call attention to themselves to be noticed in a complex recreational environment where focusing on speed and

direction while observing for peripheral traffic is essential. Numerous studies in human behavior recognize that while an object may be visible to a person, it may not be noticed or appreciated in time for the observer to effectively react to it for a variety of reasons. The work done by Senner, Jendrusch, Schaff, and Heck in their peer review papers on skier vision published in <u>Skiing Trauma and Safety, Twelfth Volume</u>(1999) illustrate this fact. Widely accepted and well-known standards for human reaction time in motor vehicle operation also apply to skiers. Only if an object calls attention to itself or is quickly and clearly recognized as important to the decision-making process of the observer may he/she effectively react to the object. Even then, what the object is made of, the full extent of the hazard it presents, and the surrounding circumstances that give meaning to the situation may elude the observer. For example, while a skier may be aware of a lift tower in the middle of a trail, he or she is not likely to be aware of the sharp edges of the steel access ladder installed on the uphill side of the tower or of the sharp anchor bolts sticking up from the base. Likewise, snowmaking stand-pipes and what they are made of, especially when they appear to be adequately protected simply are not on the radar of most customers. For these reasons, adding unnecessary additional risks of such man-made objects to beginner and lower skill-level trails and slopes was widely viewed as unacceptable in the North American mountain resort industry prior to and in 2019.

**5.0 Opinions**

1. Prior to and at the time of the incident, the Open Slope and Lower Mountain Road trails were not natural skiing and snowboarding areas, but rather man-made trails designed, created, maintained, and operated at the complete discretion of the management of the Okemo Mountain Resort.

2. Prior to and at the time of the incident, the management of the Okemo Mountain Resort knew or should have known about and complied with the First Priority of the "Safety Hierarchy" in safety engineering as well as the North American mountain resort industry "safety standards" for ski trail construction, operation, and maintenance. They should have followed those precepts with regard to the Open Slope and Lower Mountain Road trails construction, operation and maintenance in 2019 by removing the snowmaking stations from the center of the trails and moving them out of harm's way to the treed sides of the trails. The decision by Vail Resorts and Okemo Mountain to maintain snow making guns in the center of beginner terrain obligated them to properly protect the snow making equipment with

appropriate and properly installed protective devices to prevent skiers from sustaining serious injury when they would inevitably collide with the equipment.

3. Prior to and at the time of the incident, the management of the Okemo Mountain Resort knew or should have known about and complied with the Second Priority of the "Safety Hierarchy" in safety engineering as well as the North American mountain resort industry "safety standards" for ski trail construction, operation, and maintenance as well as the Vail Resorts guidelines (to keep padding "ON the snow"), and it should have followed those precepts with regard to the Open Slope and Lower Mountain Road trails construction, operation and maintenance in 2019 by correctly installing the Gilman shield on the stand-pipe with which Ric Grajeda collided. The TS-2 shield should have been "ON" and flush to the snow surface such that a skier or rider could not slide under. In addition, connecting the 12' straps together created a single strap which, if any part of the strap failed would cause both straps to fail and would not serve to hold the shield to the stand-pipe. When the plastic buckle failed either before or at the time of the collision, there was no secondary or "backup" strap to hold it onto the stand-pipe. To connect the two straps together was an improper and dangerous method of attaching the shield to the pipe especially in cold weather when it is possible that the plastic buckles would be brittle and have a potential to break more easily.

4. Prior to and at the time of the incident, the management of the Okemo Mountain Resort failed to follow the precepts of the "Safety Hierarchy", and it failed to follow the North American mountain resort industry "safety standard" and its own Vail Resort guidelines with regard to the location or protection of the snowmaking stand- pipe on the Open Slope and Lower Mountain Road trails in 2019.

5. At the time of the incident, (a) the placement of the snowmaking stand-pipe in the middle of the Open Slope and Lower Mountain Road trails, (b) the failure to effectively shield, and/or barricade the snowmaking stand-pipe on the Open Slope and Lower Mountain Road trails, (c) the failure to use effective anchoring of the TS-2 shield to the snowmaking stand-pipe, and/or (d) the failure to place the Gilman Tower Shield flush on the snow surface without any gaps for skiers to slide under, created an unnecessary, unreasonable, and unsafe condition for recreational skiers and snowboarders at the Okemo Mountain Resort in 2019.

6. The potential for colliding with and sustaining severe injury from an unprotected and exposed steel snowmaking stand-pipe on the Open Slope and Lower Mountain Road trails on the day of the incident was high and was not an inherent risk of recreational, beginner and lower skill-level skiing and snowboarding.

7. The failure of the Okemo Mountain Resort to (a) comply with the precepts of the safety engineering "Safety Hierarchy",  (b) comply with the North American mountain resort "safety standard" for ski trail construction, operation, and maintenance, (c) comply with the Vail Resorts guidelines for installing impact mitigation devices, and/or (d) place the Gilman Tower Shield flush on the snow surface without any gaps for skiers to slide under,  was/were the cause(s) of Ric Grajeda's injuries.

8. Had the Okemo Mountain Resort (a) complied with the precepts of the safety engineering "Safety Hierarchy", and/or (b) complied with the North American mountain resort "safety standards" for ski trail design, operation, and maintenance, (c) complied with the Vail Resorts guidelines for impact mitigation installation, and/or (d) placed the Gilman Tower Shield flush on the snow surface without any gaps for skiers to slide under,  Ric Grajeda would not have received the severe injuries he sustained on December 19, 2019.

9. At the time of the incident, the failure of the Okemo Mountain Resort to (a) remove the snowmaking stations from between the Open Slope and Lower Mountain Road trails, (b) effectively pad, shield, or place barriers in front of the steel snowmaking stand-pipes, and/or (c) properly place the Gilman Tower Shield flush on the snow surface without any gaps for skiers to slide under, was/were the cause(s) of Ric Grajeda's injuries.

10. At the time of the incident, had Okemo Mountain Resort (a) removed the snowmaking stations from the Open Slope and Lower Mountain Road trails, (b) effectively padded, shielded, or placed effective barriers on the steel snowmaking stand-pipes, and/or (c) properly placed the Gilman Tower Shield flush on the snow surface without any gaps for skiers to slide under,  Ric Grajeda would not have collided with the steel stand-pipe and received the resulting severe injuries he sustained on December 19, 2019.

11. Prior to and at the time of the incident, The Okemo Mountain Resort created a hazardous condition by placing snow making equipment in the center of beginner skiing terrain and failing to properly protect skiers from sustaining serious injury upon colliding with the equipment. This hazardous condition created by Vail Resorts and Okemo Mountain Resort was not inherent to the sport of skiing and snowboarding, and was created in a location where Ric Grajeda's incident was completely foreseeable and could have been prevented by the management of the Okemo Mountain Resort.

12. From the documents I have reviewed, it is my opinion that the management of Okemo Mountain Resort failed to retain crucial evidence involved in Ric Grajeda's incident, including the subject TS-2 shield and broken mounting-strap buckle with it that was next to the steel standpipe with which Ric Grajeda collided. They also failed to take crucial photographs of the accident site immediately after or at the time of the incident and improperly attempted to recreate the configuration of the shield at the time of the incident by using a different shield.

13. The Okemo daily conditions report failed to alert customers to what snow surface conditions to expect on the slopes and trails. It posted "packed powder" when all evidence suggests "hard pack" conditions with patches of wind-blown ice were prevalent on the day of December 19, 2019

I reserve the right to supplement or amend this report upon reviewing other information that may be forthcoming.

Dated this 13th day of October 2021.

_____

Dick Penniman