# EXHIBIT

# C

UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

------------------------------
RICHARD GRAJEDA III

versus
                                CIVIL ACTION FILE

VAIL RESORTS, INCORPORATED,
VAIL MANAGEMENT COMPANY and      #2:20-cv-165cr
OKEMO LIMITED LIABILITY
COMPANY d/b/a OKEMO MOUNTAIN
RESORT
------------------------------

          Volume 1 of the Deposition of RICHARD
     PENNIMAN, held via Zoom video conference, on
     Tuesday, November 2, 2021, beginning at 1:00 p.m.
     before Tari J. Gingue, a freelance court reporter
     and notary public within and for the State of
     Vermont.


A P P E A R A N C E S:

     For the Plaintiff:

          Andrew J. Smiley, Esquire
          Guy I. Smiley, Esquire
          Smiley & Smiley LLP
          122 East 42nd Street - 39th Floor
          New York, New York 10168

     For the Defendants:

          Thomas P. Aicher, Esquire
          Robyn Sweet, Paralegal
          Cleary, Shahi & Aicher, PC
          Post Office Box 6740
          Rutland, Vermont  05702-6740

REPORTED BY:

          O'BRIEN REPORTING SERVICES, INC.
              Post Office Box 711
            Rutland, Vermont 05702-0711
                (802) 747-0199

1221926b-0c26-4cba-a2cd-44fc00379ba0

Page 14

1        Q    Okay.  Did you get a written engagement from

2   them?

3        A    No, I don't.

4        Q    It's just a telephone kind of engagement?

5        A    Yeah.  We've been friends for years.  There's

6   no formal agreement.

7        Q    Did you have a written job description or

8   written engagement letter for your job at White Pine?

9        A    I believe there was, yeah.

10        Q    And am I correct that that was just one season

11   that you worked there?

12        A    I was the Patrol Director for one season, but

13   prior to that and after that I was involved with patrol

14   training and worked as a volunteer when I was there.

15        Q    Did you own a home there?

16        A    I own a half of a duplex log cabin there, yes.

17        Q    You still own one?

18        A    Yes.

19        Q    So you worked one season as the Patrol Director

20   at White Pine And was that the '07-'08 year?  Do I have

21   that right?

22        A    I believe so, yes.

23        Q    And why didn't you go back and do it a second

24   season?

25        A    I don't believe I committed to more than one

1       A    Oh.  Well, as a volunteer ski patroller I was

2   probably 19, 18 or 19, so that's a good 60 years.

3       Q    Okay.  So what year was that?

4       A    That would have been 1968 or '69.

5       Q    Okay.  And then you were actually employed at a

6   ski resort until was it 1980?

7       A    Well, those first years I was a volunteer with

8   the National Ski Patrol, the Sierra Club National Ski

9   Patrol.  And then I got a job as professional patroller

10  at Sugar Bowl in '72, '73.  And that was year after year

11  employment until 1981.  And then I was volunteering after

12  that.  And then was involved with the Chilean ski resort

13  in 77, '78.  And '78 -- no, '77 -- excuse me.  '77 and

14  '78.  And then again in '07, '08 with White Pine.  But

15  volunteered ski patrolling most of that time that I

16  wasn't professionally involved.

17      Q    What year did you start your litigation

18  consulting business?

19      A    I believe that was -- hmm.  Well, the first

20  case that I ever got was in 1979.

21      Q    So did you open Snowbridge Associates in order

22  to have a business entity to perform that consulting?

23      A    No.  The Snowbridge Associates was more for the

24  avalanche work.

25      Q    Okay.  So let's move to Paragraph 9B, if you

1    you see my 9G here?

2          A    Yes, I can.

3          Q    You cited anecdotal evidence from testimonials

4    of mountain resort managers.  So as a lawyer I've got to

5    ask you, well, testimonials to me suggests testimony.

6    Anecdotal suggests chairlift talk.  So do you have actual

7    testimonials of anybody that support your statement on

8    page 7 of your report?

9          A    Well, what I was referring to there was a

10   previous advertisement brochure by the Gilman Corporation

11   that quoted several ski resort individuals who gave

12   Richard Gilman comments about his tower shields and the

13   evidence that he has from having gotten those comments,

14   and he put those on his brochure at one time.  I may have

15   a copy of that brochure somewhere, but that's what I was

16   referring to.

17         Q    Okay.  So you don't have these testimonials

18   yourself?

19         A    I have one, yeah.  I have one.  The son of the

20   owner of White Pine decided one day to test a tower

21   shield and hit it full-steam thinking it was going to be

22   soft, which it's not.  It hurts.  But he was not injured.

23   He commented to me that he was surprised at how much it

24   hurt, but that he was able to stand up and walk away.  He

25   hit it at about 30 miles an hour, he says.  And I guess I

Page 31

1    had given him the wrong impression on what it would feel

2    like if he hit this thing.

3         Q    So do you think that my clients should conduct

4    that kind of testing with humans?

5         A    I'm sorry.  You kind of broke up there.

6         Q    Do you think my clients should conduct that

7    kind of testing with humans to find out what the

8    mitigation effects might be of the various mitigation

9    products they're using?

10        A    I wouldn't advise that.  I think I would advise

11   the kind of test that Carley Ward did.

12        Q    Okay.  You're not suggesting that there is need

13   to go out and do some human testing to find out what

14   mitigation impact effects these pads may have?

15        A    No, the testing basically has been done in real

16   life.  Racers and other skiers have hit these pads and

17   walked away.

18        Q    Oh, you have evidence of actual cases where

19   racers and other people have hit these pads and walked

20   away?

21        A    Richard Gilman does.

22        Q    Okay.  But do you have them?

23        A    No.  I'm taking his word.

24        Q    Okay.

25        A    I only have one.

Page 36

1       A    No, I don't.

2       Q    Okay.  So the lack of information reported to

3  you about serious injuries that might have occurred in

4  connection with impact accidents of Gilman products, you

5  wouldn't consider that a scientific study of any kind,

6  would you?

7       A    I don't think I understand your question.

8       Q    All right.  You cite to the lack of information

9  as a basis for your opinion.

10      A    Yes.

11      Q    But you recognize that's not a particularly

12  scientific approach to the opinion you're offering?

13      A    Well, that's a matter of style, I suppose.  I

14  have put it out there that I'd like to hear about any

15  accident -- any serious injury resulting from a properly

16  installed and configured Gilman shield.  I've asked the

17  Gilman Corporation.  They've not heard of one.  I've

18  asked you guys, the ASDA.  You guys haven't told me of

19  any.  All I can assume at this point is if there are any,

20  they're few and far between.  If there are any at all.

21      Q    Within the first half an hour you told me

22  you've worked on maybe as many as 10 cases where people

23  hired you as a litigation consultant because they were

24  hurt when they struck a padded object?

25      A    Yes.

Page 38

1    make snow and then taken off the slope before the slope

2    opened.  If we couldn't get it off the slope before the

3    slope opened, we would put a catch fence around it, and

4    we also put catch fence around this little tree.

5         Q    So you only had one snow gun at White Pine,

6    just one?

7         A    That's correct.

8         Q    So I can hear the morning meetings.  "Hey, does

9    anyone know where the snow gun is?"  So you didn't have

10   to -- you didn't have to figure out a layout and a plan

11   and a protection plan for the beginner terrain at White

12   Pine as it related to permanent snow-making

13   installations?

14        A    Correct.

15        Q    Have you testified in cases before that said

16   that it was okay for beginner terrain to have snow-making

17   stations in the center of the trails as long as it's

18   protected.  Have you said that before?

19        A    Yeah, I don't know that I said it's okay.  What

20   I've said before is if there's no alternative and there's

21   no other option, there's no way to get these things off

22   the beginner trail, then they have to be adequately

23   protected.

24        Q    That's what you said, that there's no other

25   way?

Page 91

1        Q    Okay.  So is that an and or an or that we

2    should read into this, Mr. Penniman?  Should it be all or

3    one or more?

4        A    Whatever's effective.

5        Q    Okay.  So if you properly install the Gilman

6    product on the snow-making equipment in Open Slope and

7    Lower Mountain Road, you don't need a berm?

8        A    I would think that that would be adequate.

9        Q    Okay.  So you don't have a quarrel really as

10   you sit here today with Okemo's selection of the Gilman

11   tower shield products as their preferred method of

12   mitigation in this case?

13       A    No, I don't.

14       Q    The selection, in fact, I think you're under

15   oath several times saying Gilman is the best there is?

16       A    Well, it's the best shielding there is.  There

17   are catch fences that would be a little gentler, a little

18   more flesh-friendly, as I like to call it.  You could do

19   both.  You could put a shield, and then a catch fence in

20   front of it, and the person would be slowed down by the

21   catch fence, if not caught entirely, and those are

22   usually a little gentler, a lot gentler than hitting a

23   tower shield.  But as far as causing serious injury, the

24   shield is very good.

25       Q    Okay.  And am I right that you said in the past

Page 97

1      Q    But the criss-cross fashion or not wouldn't

2    matter, because it's your opinion that he went under it?

3      A    Correct.

4      Q    So if it's criss-cross, it's still somehow

5    tight enough against that pole to be suspended above the

6    snow surface?

7      A    I don't know that.

8      Q    But I thought you had the opinion that Mr.

9    Grajeda slid under the pad?

10     A    It's not my opinion.  That's the evidence.

11     Q    All right.  So is it your opinion that he

12   struck the pad or that he went under the pad?

13     A    The evidence is he went under the pad.

14     Q    Okay.  All of the evidence?

15     A    All of the -- no, not all of the evidence.

16   I think Kennedy said he couldn't actually see the

17   collision, but that the pad fell down.  And then Chelsea

18   Manley speculated a whole bunch of stuff, so those two at

19   least were saying that he hit the -- one didn't know and

20   the other was just speculating.

21     Q    So let me ask you this, Mr. Penniman.  Are you

22   aware of any sworn testimony of any witness who saw Rick

23   Grajeda slide under the pad?

24     A    No.  There's no witness that said he slid

25   under.

Page 114

1   Grajeda was traveling faster than that group of kids that

2   he was trying to pass?

3       A    No.

4       Q    Well, didn't he say he was trying to pass them?

5       A    No.

6       Q    What did he say?

7       A    He was going around them.

8       Q    He didn't say they were still moving?

9       A    He said they were moving.

10      Q    So if they're moving and he's going around

11  them, isn't that by definition him going faster than

12  them?

13      A    No.

14      Q    Does he have the responsibility under the

15  Skier's Responsibility Code to avoid those below him?

16      A    Yes.

17      Q    And do you believe that falling while trying to

18  avoid others is an inherent risk of the sport?

19      A    That would depend on the circumstance.

20      Q    Do you believe that falling as a result of ice

21  is an inherent risk of the sport?

22      A    That depends on the circumstance.

23      Q    Do you believe that Rick Grajeda's fall was the

24  result of an inherent risk of the sport?

25      A    No.

1    or be affected.

2         Q    Right.  So in other words, if Rick Grajeda

3    wrapped himself around this thing, and his mid torso

4    struck the TS2 unit, that would not necessarily prevent

5    his feet and his head from going either side of it?

6         A    That seems like a reasonable assumption.

7         Q    All right.  And are you aware of any studies

8    that have been conducted that would support any level of

9    opinion that a person who slides mid torso, back first

10   into one of these TS2 units would suffer zero injury to

11   his spine?

12        A    I have no direct evidence of that.

13        Q    And just to be fair to the record, Mr.

14   Penniman, that's not really your area anyway, am I right?

15        A    I don't quite understand your question.

16        Q    You're not any kind of a medical human factors

17   engineer that would be able to testify in that area?

18        A    I am not a certified human factors engineer.

19        Q    And you've never held yourself out as one

20   either?

21        A    No, that's correct, I have not.

22        Q    You have suggested in testimony that you've got

23   some study in human factors from a course you took at

24   Northwestern.  Actually you audited the course?

25        A    That, and just the experience I have with

Page 177

1  skiing accidents over the course of my years, seeing lots

2  and lots of these accidents happen and studying them so.

3      Q    All right.

4      A    I don't have a degree, but I have a pretty good

5  idea what causes serious injuries.

6      Q    Right, but you're not here presenting yourself

7  as an expert to say, "hey, you know what, I am qualified

8  to say what the impact forces were on Mr. Grajeda at the

9  point where he was injured"?

10     A    That's correct.

11     Q    And "I'm not here to say that if this Gilman

12 product was properly installed, the impact forces would

13 be "x" amount less than that."  Not here to say that

14 either?

15     A    That's correct.

16     Q    And you're not here to say that "if those

17 impact forces were that much less, he would have suffered

18 zero injury."  You're not here to say that?

19     A    That's correct.

20     Q    Okay.  I'm going to read you another quote.

21 This product, quote, "is designed to flex, bend and limit

22 impact forces.  That does not mean that a skier

23 completely out of control isn't going to injure himself."

24 Do you agree with that?

25     A    Yeah.

Page 190

1    that involves traveling at speed and the possibility of

2    loss of control, the possibility of contact with others

3    and objects, if you're going to choose to do that

4    activity, you'll never eliminate the risk?

5        A    No, you won't.

6        Q    Okay.  So even using the safety hierarchy we're

7    not trying to eliminate risk, we're trying to lessen.

8    Fair?

9        A    Yeah, we're trying to limit the risk to a

10   reasonable extent.

11       Q    Okay.  Would you agree with me that using a

12   safety hierarchy and using good ski resort safety

13   principles, you would try to mitigate hazards, but you

14   wouldn't do that at the expense of altering the nature of

15   the sport?

16       A    That depends on the circumstance.

17       Q    Well, have you ever heard that before?

18       A    I've heard that inherent risks are those which,

19   if removed, would alter the very nature of whatever

20   activity you're talking about, yes.

21       Q    Right.  So let's talk about trees, for

22   instance.  Trees on the sides of trails.  You could

23   always cut down the tree the day before your client

24   strikes it and eliminate that risk, right?

25       A    You could.

Page 197

1          MR. SMILEY:  Same objection.

2     A    I have no way of knowing how much he consumed

3     or how it affects him, so I have no opinion on that

4     whatsoever.

5     Q    Does it surprise you that a beginner skier was

6     going to decide to get high the morning that he was going

7     to go skiing for the first time in several years?

8          MR. SMILEY:  Objection.  Over objection, you

9          can answer.

10    A    No, doesn't surprise me.

11    Q    I'm trying to find something that's only a few

12    minutes.  I think we already covered this, but I guess

13    I'll ask and then it'll be a good time to suspend.  But I

14    think we've already covered this.  You're not the witness

15    who's going to testify that if Mr. Grajeda struck an

16    appropriately installed and positioned TS2 unit that he

17    would not have suffered any injury?

18    A    I would testify that he -- it's highly likely

19    that he would not have sustained any serious injury.

20    Q    How are you going to do that?  How are you

21    going to provide that opinion without telling me what

22    speed he was, what the impact mitigation forces are on

23    the pad, if it's properly installed, and what those

24    forces would have been reduced to?

25    A    Based on what I've read in terms of his

Page 198

1    behavior that day, and given the history that I have of

2    the Gilman shields, that high probability of no serious

3    injury is the result.

4        Q    So you wouldn't say zero injury.  You just say

5    no serious injury?

6        A    Correct.

7        Q    Even though you're not really qualified to tell

8    us what the forces were to his spine as applied by

9    whatever it was that he hit?

10        MR. SMILEY:  Objection.  Asked and answered.

11        Over objection, you can answer.

12        A    Well, as you've pointed out, the body position

13    when he hits anything can cause minor injuries.  You

14    might have a finger bent back or bump his head and have

15    a headache, whatever.  But he's not going to suffer any

16    serious injury.  At least historically that is the

17    evidence that I have.

18        Q    And am I correct that there's a limitation in

19    your training here and expertise with respect to what

20    forces you would say were mitigated by the use of the

21    tower shield?

22        MR. SMILEY:  Objection.

23        Q    That's beyond your expertise?

24        MR. SMILEY:  Objection.  Again, asked and

25    answered.  He's not being disclosed as a

Page 199

1    biomechanical engineer.  There's nothing about

2    forces in his report.  Over objection, you can

3    answer again.

4        A    Yeah, I've answered that question.  I'm not

5    here to answer as a biomechanical engineer.

6        Q    Okay.  Have you worked on cases where skiers

7    suffered spinal injury merely by the way their body

8    landed or was positioned on the snow during a fall?

9        A    No, I can't recall any that I've investigated.

10        Q    Have you ever heard of a scorpion-style fall?

11        A    No.

12        Q    Can you envision that in your head, where

13    someone falls, they're on their stomach, and their feet

14    come up behind them?

15        A    I sure can.

16        Q    And you have not worked on a case where there

17    was a scorpion style fall where someone suffered a spinal

18    cord injury merely as a result of the way they impacted

19    with the snow?

20        A    Not that I can recall, no.

21        Q    Do you agree with all of Mr. Grajeda's

22    companions that each of these snow-making stations were

23    clearly visible from a distance?

24        A    Yes.  The -- the elements of it were not.  The

25    fact that they existed there, there was something there

Page 205

1              C E R T I F I C A T E

2
    STATE OF VERMONT,      )
3   CALEDONIA COUNTY, SS. )

4
        I, Tari J. Gingue, a Notary Public, within and for
5   the State of Vermont, do hereby certify that I took the
    deposition of RICHARD PENNIMAN, a witness appearing via
6   Zoom video conference, on Tuesday, November 2, 2021.

7       I further certify that said witness was sworn to
    testify the truth, the whole truth, and nothing but the
8   truth, and that the foregoing testimony was taken by me
    stenographically and thereafter reduced to typewriting,
9   and the foregoing 204 pages are a full, true and correct
    transcription of the testimony of said witness, to the
10  best of my ability.

11      I further certify that I am not related to any of
    the parties thereto or their Counsel, and that I am in no
12  way interested in the outcome of said cause.

13      Dated at St. Johnsbury, Vermont, this 7th day of
    November, 2021.

14

15

16

17

18
                        _____
19                       Tari J. Gingue,  Notary Public
                         License #157.0008935
20
        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
21  NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS
    UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
22  CERTIFYING REPORTER.

23

24

25

1221926b-0c26-4cba-a2cd-44fc00379ba0

Page 208

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT
-------------------------------------
RICHARD GRAJEDA, III,

                    Plaintiff,

          v.                    CIVIL ACTION FILE
                                #2:20-cv-165cr

VAIL RESORTS, INCORPORATED, VAIL
MANAGEMENT COMPANY and OKEMO
LIMITED LIABILITY COMPANY d/b/a
OKEMO MOUNTAIN RESORT,

                    Defendants.
-------------------------------------

                VOLUME TWO
            of the continued
            D E P O S I T I O N

                  -of-

            RICHARD PENNIMAN

held on Tuesday, November 9, 2021, via Zoom
teleconferencing platform, commencing at 1:00 p.m.


APPEARANCES:
ANDREW J. SMILEY and GUY I. SMILEY, ESQUIRES,
Smiley & Smiley LLP
122 East 42nd Street - 39th Floor
New York, New York  10168
                On behalf of the Plaintiff;

THOMAS P. AICHER, ESQUIRE
Cleary Shahi & Aicher, PC
110 Merchants Row, P.O. Box 6740
Rutland, Vermont  05702-6740
                On behalf of the Defendants.

ALSO PRESENT:  Robyn Sweet, Paralegal

LINDA C. O'BRIEN, Registered Professional Reporter
and Licensed Court Reporter in NH - #130
Vermont Notary Public License #157.0004436

            O'BRIEN REPORTING SERVICES, INC.
                1-802-747-0199

Page 264

1        ago?
2    A.   Yeah.  Yeah, I think so, as far as I can
3         remember.  If something jogs my memory, I'll
4         cut in, but that's, that's the last one I
5         remember.
6    Q.   All right.  We talked a little bit about the
7         term "engineer" and you mentioned the Society
8         of Safety Engineers that have qualified you as
9         an engineer, do you remember that?
10   A.   When they were the American Association of
11        Safety Engineers they had a qualifying process
12        that I participated in and I was accepted.
13        They've now changed their name to the American
14        Society of Safety Professionals.
15   Q.   Gotcha.  So they took the "engineer" out?
16   A.   Looks like it.
17   Q.   Has any other organization ever qualified you
18        or accepted you as an engineer of any kind
19        that you're aware of?
20   A.   Not that I can think of at the moment, no.
21   Q.   Okay.  And you are not a biomechanical
22        engineer?
23   A.   That is correct.
24   Q.   And you're not qualified to testify with any
25        scientific certainty as to what specific

Page 265

1          injuries may be mitigated by padding?

2                   ATTORNEY SMILEY:  Objection.

3     A.   I'm not sure what you mean by scientific

4          certainty.  I mean, if you look at the body of

5          evidence of a history of a device or system,

6          carefully and, ah, completely, I would say

7          that's a fairly scientific approach.

8     Q.   So you are qualified to testify to a degree of

9          scientific certainty as to what specific

10         injuries may be mitigated by padding?

11    A.   Ah, depends on the padding.  Depends on a lot

12         of things.

13                   With respect to the Gilman system, I

14         think I can testify with a high degree of

15         certainty, whether you want to call it

16         scientific certainty or not depends on your

17         definition of that.  I would say that I've

18         done a lot of research on it and have kept

19         track of it year to year, day-to-day, looking

20         for any weaknesses in the system and I haven't

21         found any.

22                   I've done scientific tests on those

23         systems, participated in scientific tests.

24         I've -- yeah.  I would say with scientific

25         certainty that the Gilman shield system will

c50d1810-ab4f-4075-9f81-11808b571652

Page 266

1        mitigate injuries to an acceptable degree of G

2        forces for the human body.  I participated in,

3        in that very study.  So, yeah, I think so.

4    Q.  What G forces are acceptable?

5    A.  I don't recall off the top.  I'd have to look

6        at the study again.

7    Q.  So is that the Carlie Ward study?

8    A.  Yes, it is.

9    Q.  So why don't we put that -- it's a two-page

10        document that we've been shown that came from

11        your file.  Why don't we mark that as Exhibit

12        23.

13                (Exhibit No. 23 marked for

14        identification.)

15                ATTORNEY SMILEY:  Was there a 22

16        Exhibit, Tom?  Robyn?

17                ATTORNEY AICHER:  There will be.

18                ATTORNEY SMILEY:  Okay.

19    Q.  (BY ATTORNEY AICHER)  Do you recognize what

20        we're showing you as Exhibit 23?

21    A.  Yes, I do.

22    Q.  And it's a two-page document.  I'll just

23        toggle to the second page.

24    A.  Okay.

25    Q.  So you've had a chance to look at Exhibit 23

Page 267

1           with us just briefly?

2    A.     I didn't review it but, ah, if you could

3           expand it a little bit so I can see it better,

4           I'd appreciate that.

5    Q.     Have you had a chance to look at it just to

6           identify whether this is the study that you

7           were mentioning?

8    A.     Yes.  Yes.

9    Q.     And do you have anymore pages in your file of

10          the Carlie Ward study other than these two?

11   A.     Yeah.  It's about an inch thick of just graphs

12          and stuff.  This is the summary of all of

13          that.

14   Q.     All right.  So -- and when you say "this,"

15          this Exhibit 23 is the summary of all of that

16          data?

17   A.     Yes.  I haven't looked at it critically for

18          quite a while but, yeah.

19   Q.     So tell me what we're looking at on page 1 of

20          Exhibit 23.  What is this chart saying?

21   A.     Ah, well, you've got the various -- in

22          configuration, you've got various pads and

23          shields.

24   Q.     Okay.

25   A.     And then across the top you've got impact

Page 268

1      speed.  The test was at 16 miles per hour.

2      And then I'm not sure what the X-G-Y-G-Z-G-R-G

3      is, but the comments on the right show what

4      the reduction was of the various systems.

5  Q.  So did Dr. Ward do this test at different

6      MPHs?

7  A.  No.  I think they were all at 16 miles an

8      hour.

9  Q.  So what are the G forces that would apply to

10     the impactor that is being run at 16 miles an

11     hour in her tests.

12 A.  Well, it's a reduction in the G forces.

13 Q.  But, in order to get a reduction, don't you

14     have to have a number to start with?

15 A.  Yeah.  I would have to go back and review this

16     study to give you meaningful answers on this.

17     I just didn't review this before the

18     deposition, so you have to give me some time

19     to do that.

20 Q.  Let's look at the second page.  I'm looking at

21     the column that she hand wrote on the right

22     here, and I'm not seeing anywhere that she

23     identified that any of these shields would

24     reduce the impact forces 100 percent?

25 A.  Oh, none of them do, of course.  You can't do

Page 269

1           that.  Ha-ha-ha.

2     Q.    All right.  So they're percentages of the

3           forces that would apply at the miles per hour

4           that she calculated?

5     A.    Right.

6     Q.    Okay.  So she calculated the impact forces

7           based on 15.7 or 16 miles an hour each time?

8     A.    Yes.

9     Q.    All right.  Which one of these devices on

10          these two pages is the Gilman TS-2 device?

11    A.    I'm not sure which one it is.  I think it's

12          the tower wrap.

13    Q.    So which, which page is that on?

14    A.    It's on the page we're looking at.

15    Q.    So the fourth one down?

16    A.    Three-inch diameter pole with tower wrap, I

17          believe, is the one that is the Gilman

18          cylinder.

19    Q.    All right.  Do you have records that reflect

20          that somewhere?

21    A.    Yeah.  It's in the big study.  I'd have to go

22          back and look at that and see exactly which

23          one it is.

24    Q.    Okay.  What -- what did she use for an

25          impactor?

Page 270

1    A.    Ah, she used a test dummy on -- it's the upper

2          torso of a test dummy with impact sensors on

3          it.  And we drove -- it was mounted on the

4          side of a truck.  The, ah, device was set up

5          on the track and the truck was driven at 16

6          miles an hour so that the test dummy torso

7          would impact the item being tested.

8    Q.    Do you know if she was measuring peak force or

9          average force?

10   A.    No.  I'm not sure, without going back and

11         really looking at the study, what she was

12         averaging.  There were several impact sensors

13         on the test dummy and it was probably an

14         average of the sensors in terms of impact

15         force, but I'm not sure about that.

16   Q.    Do you know what the duration of the force was

17         that she was measuring?

18   A.    Instantaneous.

19   Q.    Do you know what the accuracy was and how she

20         calculated accuracy?

21   A.    That would have to be in the body of the study

22         which I'd have to review.

23   Q.    Are you sure it's in there or is it something

24         we'd have to ask her?

25   A.    You might have to ask her.  I don't know.  I

Page 271

1       haven't looked at the study in a long time.

2   Q.  And do you feel confident that you could have

3       done -- you could have designed and conducted

4       the same test yourself?

5   A.  Yes.

6   Q.  You think you're qualified to have done that?

7   A.  Yes.

8   Q.  Do you know what the -- what the measuring

9       units -- how they were calibrated?

10  A.  I don't know what device she was using to

11      calibrate all of that.

12  Q.  Do you feel like you're qualified to conduct

13      the calibration of impact -- impactor

14      measuring devices?

15  A.  I would have to read the instructions, but

16      they're pretty simple.  Yeah.

17  Q.  Okay.  Do you know whether any of Dr. Ward's

18      impact testing involved a crash test dummy

19      that sustained a sideways impact?

20  A.  No.  These were all blunt force to the chest.

21      This was done for a specific accident in which

22      that was the case, ah, and so that was the

23      test.

24  Q.  All right.  So you don't -- you don't know of

25      any studies that would reflect any type of

Page 298

1                C E R T I F I C A T E

2    UNITED STATES DISTRICT COURT - DISTRICT OF VERMONT

3   DEPOSITION OF:   RICHARD PENNIMAN

4   RE:   RICHARD GRAJEDA, III v. VAIL RESORTS, ET AL.

5   CIVIL ACTION FILE #2:20-cv-165cr

6

7        I, LINDA C. O'BRIEN, a Registered Professional
    Reporter and Notary Public in and for the State of
8   Vermont, do hereby certify as follows:
         1.   That RICHARD PENNIMAN, the witness whose
9   testimony is hereinbefore set forth, was duly
    recorded by me on Tuesday, November 9, 2021;
10        2.   That such testimony was transcribed by me
    and is a true and accurate record of the testimony
11  given by the said witness, to the best of my
    knowledge, skill and ability;
12        3.   I further certify that I'm neither
    attorney for, nor related to or employed by any of
13  the parties, nor financially interested in this
    matter; and
14        4.   That a dash as used through this
    transcript is meant to represent an interruption in
15  thought or between a question and answer.
         IN WITNESS THEREOF, I hereunto set my hand and
16  Notarial seal this 30th day of November, 2021.

17

18

19                    _____
                      Linda C. O'Brien, RPR
                      Registered Professional Reporter
20                    and Notary Public
                      Commission #157.0004436
21                    My Commission Expires:  1-31-2023
                      Commissioner of Deeds - NH
22                    New Hampshire License #130

23

24

25