U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2023 JUN 30  PM 1: 34

CLERK

BY_____
DEPUTY CLERK

RICHARD GRAJEDA,                      )
                                      )
        Plaintiff,                    )
                                      )
        v.                            )        Case No. 2:20-cv-00165
                                      )
VAIL RESORTS INC., VAIL RESORTS       )
MANAGEMENT COMPANY, and OKEMO         )
LIMITED LIABILITY COMPANY d/b/a/      )
OKEMO MOUNTAIN RESORT,                )
                                      )
        Defendants.                   )

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Doc. 89)

Plaintiff Richard Grajeda brings this negligence action against Vail Resorts Inc.,

Vail Resorts Management Company, and Okemo Limited Liability Company

(collectively, "Defendants"), seeking damages for injuries he sustained in a collision with

a snowmaking station while skiing at Okemo Mountain Resort ("Okemo"). Plaintiff

claims Defendants inadequately padded the snowmaking station because the padding did

not extend to the base of the station, allowing him to collide with the station's bare metal

pole. He also asserts that Defendants negligently placed the snowmaking station in the

center of a beginner's trail.

Pending before the court is Defendants' June 1, 2022 motion for summary

judgment. (Doc. 89.) Plaintiff responded to the motion on July 14, 2022 (Doc. 98), and

Defendants replied on July 28, 2022. (Doc. 104.) The court held a hearing on September

27, 2022 and a *Daubert* hearing on January 13, 2023 and March 10, 2023 on the

admissibility of the opinions of Defendants' expert witness Dr. Irving Scher, at which

point it took the motion for summary judgment under advisement.

Plaintiff is represented by Andrew J. Smiley, Esq., Guy I. Smiley, Esq., and

Matthew D. Anderson, Esq. Defendants are represented by Kristen L. Ferries, Esq., Craig
R. May, Esq., Habib Nasrullah, Esq., Joel P. Iannuzzi, Esq., and Thomas P. Aicher, Esq.

## I.    The Undisputed Facts.

On December 19, 2019, Plaintiff went skiing with friends at Okemo. At the time,
there were no issues with visibility. Plaintiff had skied twice before, approximately seven
years prior, and considered himself to be a beginner skier. That morning, Plaintiff rode
the B Quad chair lift to a ski trail called "Lower Mountain Road." During his first run
down that trail, Plaintiff fell while attempting to come to a complete stop but was able to
"g[e]t back up and resume[]" skiing. (Doc. 89-4 at 19.) As he was skiing, he passed
several pieces of snowmaking equipment.

On his second run, Plaintiff again rode the B Quad chair lift and began skiing
down the same trail. As he approached the lower section of Lower Mountain Road, he
encountered a group of ski school students crossing the trail in front of him. Plaintiff saw
the group when they were approximately fifteen to twenty feet ahead of him and veered
to the left to avoid them. As he did so, he hit an icy patch and fell onto his left hip. His
skis came off and he slid down the ski trail on his left side and then on his stomach.
Plaintiff's head and shoulders faced uphill as he slid, so that he could not see where he
was sliding. He testified in deposition that: "As I was sliding, [I] felt a dip in the snow,
and then I went under something, and I slammed into a metal pole or a steel pole." *Id.* at
31. He later stated: "The impact was very hard on my back. I could almost feel it
reverberating or something." (Doc. 98-12 at 3.)

Okemo employee Ray Kennedy stated that he saw Plaintiff ski toward a
snowmaking station, then saw the station's padding "shudder" and fall from an "upright"
position to lay horizontally. (Doc. 89-5 at 3-5.) Mr. Kennedy did not see the actual
collision. Okemo Director of Ski Patrol Chris Lancaster acknowledged that beginner
skiers regularly fall on Lower Mountain Road and another beginner ski trail named Open
Slope.

On December 19, 2019, Okemo's assistant on-snow services and trail maintenance
manager Kyle Kostura recorded that "all blue padding was covering their respective

snowmaking infrastructure as of my departure at 0900." (Doc. 89-6 at 2.) Mr. Kostura
testified in deposition that he did not specifically recall checking the Gilman TS-2
padding on the snowmaking station prior to Plaintiff's collision but that it "was part of a
visual ride through" that he conducted from his snowmobile that morning to confirm that
the padding straps were attached to the snowmaking station and that there were no gaps
between the padding and the snow. (Doc. 89-7 at 3.)[1] He has never seen a pad that was
not touching the snow surface, although he sometimes needed to dig a buried pad out of
the snow. He explained why pad placement is important:

> Q. Why is it necessary for the pad to be flush[] on the snow and not on
> different levels?
>
> A. Two reasons: One, it's esthetic. No. 2, it's how the pad is properly
> supposed to be fitted up against the gun.
>
> Q. And why is it supposed to be fit up against the gun flush[] as opposed to
> uneven?
>
> A. So that's their whole purpose is to prevent somebody from sliding
> underneath it and we want the pad to take the blow, so to speak.

(Doc. 98-8 at 3.)

Defendants' policy is therefore to ensure snowmaking equipment is properly

padded:

> Q. What about ski patrol, do you know what was expected of ski patrollers
> when they would do any type of inspection of pads on tower guns -- on
> snow guns? Sorry.
>
> A. Our responsibility what we train our staff is to ensure that the pad is
> clear of snow facing up the fall line and flush with the ground.
>
> Q. What do you mean when you say flush with the ground?
>
> A. I mean it doesn't have a large gap or isn't buried in snow. So depending
> on snow making, we look to see that it's resting on the ground in front of
> the gun generally.
>
> Q. Am I correct when you say that it's supposed to be flush on the ground
> and there's not supposed to be gaps or uneven levels between the base of a

---

[1] *See* Doc. 89-7 at 3 ("Q. Did you check on that specific snowmaking gun and padding that
morning, December 19, 2020, before the lifts opened? A. It was part of a visual ride through,
yes. Q. Do you have an actual recollection of check in on that? A. Not that specific one, no.).

Gilman tower pad and a snow surface?

A. Sometimes an uneven level is unavoidable. We try to avoid having a gap.

Q. Why do you try to avoid having a gap? What is the reason for that?

A. I'm pausing because it's common sense, I guess, we want them to be flush with the ground because a skier would impact the pad if they were to be sliding in that direction. We obviously don't want a gap below it.

(Doc. 98-7 at 11-12.)

An agent of the pad's manufacturer testified that a Gilman TS-2 pad should prevent a skier from striking the padded pole:

So if the individual were to hit the blue blanket where the cylinders are it is designed to crumple to decelerate him to stop him from actually ending up hitting the metal object behind it. It is impossible to get through the blanket and those two tower cylinders to get to that object.

(Doc. 98 at 20) (quoting Doc. 96-4 at 68). She is not aware of any instance in which a skier suffered serious injuries after colliding with a Gilman TS-2 pad. (Doc. 96-4 at 3.)

Plaintiff acknowledges that "snowmaking equipment is a necessary part of the operation of a ski area[.]" (Doc. 89-4 at 26.) He agrees that icy patches, other skiers, and colliding with manmade or natural objects may be inherent risks of skiing. He further agrees that the "Responsibility Code" requires skiers to ski in control at all times to avoid people and objects and is "pretty commonsense" and applies to "things like this snowmaking pipe[.]" (*Id.* at 24.)

According to Plaintiff's expert witness Dick Penniman, there are instances when "placing man-made structures in the fall line of beginner or lower skill-level trails is unavoidable" (Doc. 88-3 at 10) and where removal of fixed objects such as snowmaking station standpipes is "not practical[.]" *Id.* at 7. He testified that Gilman TS-2 "shields," the type of padding on the snowmaking station involved in Plaintiff's collision, is "the best shielding there is. . . . [A]s far as causing serious injury, the shield is very good." (Doc. 88-4 at 9.)

According to Defendants' ski safety expert, Mark Petrozzi, Okemo had portable

4

snowmaking devices prior to 2019 and that, "with trade[-]offs," those devices could have been used to make snow in the area in which Plaintiff fell instead of an immovable snowmaking station such as the one at issue in this case. (Doc. 98-5 at 3-4.) He acknowledges that Okemo used to make snow on the trail in question using portable guns and that, but for Defendants' placement of the snowmaking gun, Plaintiff's injuries would not have occurred.[2] Vail Resorts Director of Health and Safety Dana Kent agreed that Defendants could have relocated the snowmaking station elsewhere.

## II.    The Disputed Facts.

### A.    Whether the Snowmaking Gun Was in the Middle of a Beginner Trail.

The parties dispute whether the snowmaking station Plaintiff struck was on the side or in the middle of the ski trail. Citing Plaintiff's deposition testimony that the snowmaking equipment he hit was "[o]ff to the side" of the ski trail, Defendants contend that the station was between the Lower Mountain Road and Open Slope ski trails, but not in the middle of the trail. (Doc. 89-4 at 27.) Photographs, however, support a conclusion that it is located closer to at least one of the trails' center. Mr. Petrozzi testified that the snowmaking equipment in question "[was] not trail side" and "other than knowing how they designate [the trails], not if you're just there skiing there you probably wouldn't" know where one trail ends and the other begins. (Doc. 96-2 at 3.)

Although the location of the snowmaking station is a fixed point that cannot be disputed, the parties disagree as to the proper characterization of that location. This is not a dispute that precludes summary judgment. *See Korn v. Fed. Ins. Co.*, 2019 WL 4277187, at *5 (W.D.N.Y. Sept. 10, 2019) (holding that disputed facts did not preclude

---

[2] Q. Okay. But specifically the risk of striking that snow making station didn't exist prior to 1993, correct?

A. Of course not.

Q. Okay. And if that snow making station wasn't there at the time of Rick's skiing on December 19, 2019, he wouldn't have had a risk of striking it, would you agree with that?

A. Yes.

(Doc. 98-5 at 8-9.)

summary judgment where they "consist[ed] of arguments regarding the proper characterization of undisputed evidence as opposed to actual disputes of fact").

## B.    Whether the Snowmaking Gun was Properly Padded and Whether Plaintiff Struck the Pole.

The parties further dispute whether the Gilman TS-2 padding was properly attached to the snowmaking equipment. Plaintiff maintains that a gap existed between the bottom of the padding and the surface of the snow, allowing him to slide beneath the padding and collide with the snowmaking gun's metal pole. In addition to his own testimony, he cites deposition testimony from individuals who arrived soon after the accident, one of whom testified that when he arrived, Plaintiff "was underneath the pole, underneath the blue foam padding . . . within that little ravine of where that drop-off is" and that he was lying "on his stomach[] . . . [b]asically making a T with his body against the pole." (Doc. 85-8 at 2-3.) Okemo ski patroller Michael Morabito noted that when he arrived, Plaintiff "was up against the post. And his body was a little angulated that way, he was definitely not straight." (Doc. 85-9 at 3.) When asked whether Plaintiff had struck the metal pole, Mr. Morabito stated: "I couldn't tell exactly how he got into the position that he was in." *Id.*

Plaintiff also proffers statements from various reports and emails which Defendants either contend are inadmissible hearsay[3] or were not submitted.[4] Okemo's investigation report includes an "Incident Card" which states "I was going down and

---

[3] On summary judgment, Plaintiff need only establish the evidence will be admissible at trial. *See Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006). Certain contested evidence may be a business record or a statement made for the purpose of medical diagnosis and treatment. "Under the [latter] exception the statement need not have been made to a physician. Statements to hospital attendants, ambulance drivers, or even members of the family might be included." Advisory Committee's Note to Fed. R. Evid. 803(4). The statements also need not be made by the victim and may be admissible even if the declarant is unavailable as a witness. *See Danaipour v. McLarey*, 386 F.3d 289, 297-98 (1st Cir. 2004) ("[S]tatements by bystanders, family members, and others, made for the purposes of treating an injured person and pertinent to that treatment, have often been admitted under Rule 803(4).") (internal quotation marks and citation omitted).

[4] Plaintiff cites an email Vail Resorts Director of Health and Safety Dana Kent sent to unnamed individuals on the day of the incident which is not part of the record.

6

there were people to my right so I went left then slide into the pole" as the "Guest Description of Incident[.]" (Doc. 85-5 at 29.) It includes a "Witness Statement Form" signed by David Villani which, in response to the prompt "What Did You See/Hear Occur?", states "He saw his friend face down wrapped around pipe four people around him no patrol yet[.]" *Id.* at 46.

An incident report written by Ludlow Ambulance Service EMS Care Provider Gregory Stoughton states: "I received report from ski patrol that the patient had struck a pole, and was complaining of chest and hip pain, and unable to feel his legs[,]" and "[t]he patient reports skiing and trying to avoid a collision with another skier when he struck a chairlift pole. He does not recall any additional impacts, however bystanders state he then slid underneath the padding on the pole." (Doc. 85-12 at 2.)

Although Plaintiff claims that he slid under the pole and was located under the padding, Defendants contend their expert Dr. Scher will testify that Plaintiff's injuries are consistent with him not striking the pole because, among other things, there was scant evidence of bruising.[5] Dr. Scher further opines that because of Plaintiff's excessive speed at the time of the collision, his injuries were inevitable and would have been the same if he struck a properly padded pole.

Defendants further cite evidence that bystanders removed the padding after the collision as well as the deposition testimony of Okemo ski patroller Mary Mancino that when she responded to the scene, she observed Plaintiff "was up against a snow making station . . . against, like the padding in front of the snow making station." (Doc. 104-1 at 3.) Ms. Mancino stated that there was padding on the snowmaking gun when she arrived and that "[Plaintiff's] body was – I believe – he was on his belly and his left side was to the snow making station. His head was uphill and the padding was kind of over him as if it had been dislodged a little bit[,]" meaning that "[t]he top [of the padding] was slightly out as if he had hit the bottom of the pad and knocked the top out." *Id.* at 3-4. She further

---

[5] Plaintiff challenges Dr. Scher's qualifications to offer such an opinion which the court will address in a separate ruling.

7

testified that "[a]s we were arriving on scene," an unknown individual took the padding "off and over the patient" so that ski patrol could better access him. *Id.* at 5.

There are thus genuine issues of material fact as to whether Plaintiff struck the padding or the pole, whether the padding was attached and flush with the snow, and whether it makes a difference in terms of causation.

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

The court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248).

In ruling on summary judgment, the court "constru[es] the evidence in the light most favorable to the non-moving party" and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (internal quotation marks omitted). There is no genuine dispute where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d

Cir. 2009) (internal quotation marks omitted) (alteration in original). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Id.* at 166-67 (internal quotation marks omitted) (alterations in original).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita*, 475 U.S. at 586). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). However, if the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Id.* at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor*, 609 F.3d 537 at 545 (internal quotation marks omitted).

Notwithstanding the existence of disputed issues of fact, Defendants contend that under any version of the facts they are entitled to judgment as a matter of law in their favor.

## B.     Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Negligence Claim Under Vermont's Sports Injury Statute.

Under Vermont law, "[c]ommon law negligence has four elements: a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Demag v. Better Power Equip., Inc.,* 2014 VT 78, ¶ 6, 197 Vt. 176, 179, 102 A.3d 1101, 1105 (internal quotation marks omitted). Defendants argue that under Vermont's Sports Injury Statute, 12 V.S.A. § 1037, they had no duty to exercise reasonable care with respect to the snowmaking equipment Plaintiff

9

struck because Plaintiff's injuries resulted from an obvious and necessary danger inherent in the sport of skiing.

### 1.     The Burden of Proof under the Sports Injury Statute.

This court has previously ruled that it is a defendant's burden to establish that the Vermont Sports Injury Statute applies and eliminates a duty of care. *See Mejia-Haffner v. Killington/Pico SKI Resort Partners, LLC*, 2016 WL 6476958, at \*2 (D. Vt. Nov. 1, 2016)) ("The court will place the burden of proof with respect to 12 V.S.A. § 1037 on the defendant.") (Crawford, J.). In *Sklar v. Okemo Mountain, Inc.*, however, the District of Connecticut reasoned more persuasively that "primary assumption of risk relates specifically to the existence of a duty rather than to the availability of a defense to an established breach" and the Vermont's Sports Injury Statute "relates specifically to the existence of a duty on the part of the defendant." 877 F. Supp. 85, 88-89 (D. Conn. 1995). "Since the burden of proving the existence of a legal duty properly falls on Plaintiffs, the burden of proving that the risk is not inherent in the sport also falls on Plaintiffs." *Id.* at 88.

The Second Circuit has similarly held it "was not error" to place the burden on a plaintiff to prove a duty exists notwithstanding the Sports Injury Statute. *See Madhessian v. Stratton Corp.*, 210 F.3d 355, at \*2 (2d Cir. 2000) (unpublished summary opinion).

In *Rosen v. Jay Peak*, No. 21-cv-00006 (D. Vt. June 15, 2023), this court recently placed the burden of establishing a duty of care under the Vermont Sports Injury Statute on the plaintiff. In so doing, the court reasoned that whether a duty exists in the first instance is a "threshold issue" that a party must establish in presenting his or her case to a jury. *See id.* at Doc. 77 at 7, 9 ("As a threshold issue, you must first decide whether a Vermont law known as the 'Sports Injury Statute' applies in this case. . . . It is Dr. Rosen's burden to establish a duty of care under the Sports Injury Statute."); *see also Est. of Frant v. Haystack Grp., Inc.*, 641 A.2d 765, 766 (Vt. 1994) ("[W]hether the ski area's use of wooden corral posts was an 'obvious and necessary' risk should have been a threshold question of fact decided by the jury."). This is consistent with Vermont tort law, which requires a plaintiff to establish a duty as part of any negligence claim. *See*

10

*Demag*, 2014 VT 78, ¶ 6 (identifying establishment of a legal duty as the first element of common law negligence). The court thus follows *Madhessian*, *Sklar*, and *Rosen* instead of *Mejia-Haffner*.

### 2. Whether Colliding with Snowmaking Equipment is a "Necessary and Obvious Risk of Skiing" under 12 V.S.A. § 1037.

Under Vermont law, "a person who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as they are obvious and necessary." 12 V.S.A. § 1037. Section 1037 incorporates the primary assumption of risk doctrine, the "essence of [which] is that certain situations involve dangers so obvious and necessary that the defendant does not owe any duty to the plaintiff, and therefore is not required to warn its patrons of the dangers or take any steps to eliminate them." *Nelson v. Snowridge, Inc.*, 818 F. Supp. 80, 82 (D. Vt. 1993); *see also Est. of Frant*, 641 A.2d at 769 (finding that "§ 1037 can only incorporate one of these views, and . . . the *Wright/Sunday* theory of primary assumption of risk is the one that has been retained").

"[W]hat risks in a sport are inherent, obvious, or necessary to its participation[] [is] a question that ordinarily must be resolved by the jury." *Dillworth v. Gambardella*, 970 F.2d 1113, 1119 (2d Cir. 1992).[6] Defendants contend that because ski resorts could not operate without snowmaking, colliding with snowmaking equipment on trails is an "obvious and necessary" danger inherent to skiing as a matter of law. Like the risks posed by ice in *Nelson v. Snowridge, Inc.*, 818 F. Supp. at 83, or by dense fog in *Covel v. Mt. Mansfield Co.*, 237 A.D.2d 791, 792 (N.Y. App. Div. 1997), Defendants assert that "the only way to eliminate the risk of collision with snowmaking equipment would be to close Okemo whenever there isn't enough snow to ski." (Doc. 89 at 16.)

Ice and fog are natural phenomena that a ski resort could neither reasonably eliminate nor control. *See Nelson*, 818 F. Supp. at 83 (noting that "[n]o improvements in

---

[6] *See also Est. of Frant v. Haystack Grp.*, Inc., 641 A.2d 765, 771 (Vt. 1994) (Allen, J., concurring) ("Ordinarily, the question of whether a danger is obvious and necessary within the meaning of 12 V.S.A. § 1037 should be resolved by a jury."); *Umali v. Mount Snow Ltd.*, 247 F. Supp. 2d 567, 575 (D. Vt. 2003) ("Whether a risk is inherent, obvious and necessary to a sport is ordinarily an issue appropriate for a jury.").

grooming technique have been able to eliminate ice from the New England ski slopes");
*Covel*, 237 A.D.2d at 792 ("A ski area operator is not charged with the duty of preventing
or warning patrons of such uncontrollable 'mutations of nature[.]'") (quoting *Wright v.
Mt. Mansfield Lift,* 96 F. Supp. 786, 791 (D. Vt. 1951)). For this reason, the Vermont
Supreme Court has held that "[s]kiers should be deemed to assume only those skiing risks
that the skiing industry is not *reasonably required* to prevent." *Est. of Frant*, 641 A.2d at
771 (emphasis supplied). Unlike *Nelson* or *Covel*, "[t]his case raises no issues involving
the weather, or conditions that cannot reasonably be controlled by the operator. It instead
involves the necessity and obviousness of the risk associated with a person-made"
snowmaking station on a beginner slope. *Umali v. Mount Snow Ltd.*, 247 F. Supp. 2d 567,
575 (D. Vt. 2003).

Under Vermont law, a "necessary" risk is one that "is impossible or unreasonably
difficult or expensive to eliminate." *Dillworth v. Gambardella*, 776 F. Supp. 170, 172 (D.
Vt. 1991), *aff'd*, 970 F.2d 1113 (2d Cir. 1992). Stated differently, "necessary dangers are
those that are there *even when* due care is exercised. A person need accept only those
risks that are inherent in the sport, not those increased risks that are cause[d] by another's
failure to use due care." *Dillworth*, 970 F.2d at 1121 (internal citation omitted) (alteration
in original).

Defendants cite case law from other states finding that colliding with snowmaking
equipment is an obvious and necessary risk of skiing under those states' sports injury
laws.[7] These statutes are inapposite. "In drafting 12 V.S.A. § 1037, the [Vermont]

---

[7] *See, e.g.*, MICH. COMP. LAWS ANN. § 408.342 (West 1981) (defining "obvious and necessary"
dangers of skiing as "includ[ing], but are not limited to, injuries which can result
from . . . collisions with ski lift towers and their components, with other skiers, or with properly
marked or plainly visible snow-making or snow-grooming equipment"); ME. REV. STAT. ANN.
tit. 32, § 15217 (West 2007) ("'Inherent risks of skiing' means those dangers or conditions that
are an integral part of the sport of skiing, including . . . water or air pipes, snowmaking and
snow-grooming equipment, . . . and collisions with or falls resulting from such man-made
objects[.]"); 42 PA. STAT. AND CONS. STAT. ANN. § 7102(c) (West 2011) (providing that "there
are inherent risks in the sport of downhill skiing"); *see also Lin v. Spring Mountain Adventures,
Inc.*, No. CIV.A. 10-333, 2010 WL 5257648, at *8 (E.D. Pa. Dec. 23, 2010) ("Collisions with
equipment necessary for the operation of a ski facility, such as snow making equipment, are

legislature avoided cataloguing fact-specific examples of 'obvious and necessary' risks inhering in sports such as skiing." *Est. of Frant*, 641 A.2d at 770.

> The legislature thereby recognized, as *Wright* demonstrates, that yesterday's necessary skiing risks tend to become, with the passage of time and advancement of technology, reasonably avoidable. At the time *Wright* was decided, skiers were forced to assume the risk of colliding with snow-covered tree stumps, because grooming and inspection techniques in 1949 had not evolved to where it was feasible to detect and remove, or warn skiers about, such hazards. As Frant's expert witness suggested, state-of-the-art technology has evolved well beyond the early stages. Even the ski industry now concedes that today the failure to detect a tree stump could serve as the basis for negligence "in view of improved grooming techniques." *See* [*Sunday v. Stratton Corp.*, 390 A.2d 398, 402 (Vt. 1978)]. The language of 12 V.S.A. § 1037 is broad enough to account for safety improvements in the skiing industry. We do not think the legislature's purpose in reasonably protecting the skiing industry is compromised by asking a jury to supply a contemporary sense of what constitutes an obvious or necessary risk.

*Id.* at 770-71.

Adopting the standards set by other states' sports injury laws would be inconsistent with the Vermont Supreme Court's interpretation of 12 V.S.A. § 1037, which generally allows a jury to evaluate which risks and dangers are inherent to the sport of skiing and which recognizes that certain risks may be eliminated by advancements in technology and other developments in a sport.

In deciding which risks and damages are inherent in skiing as a matter of law, a court must thus proceed with caution. As the Second Circuit observed:

> Given changes in the methods and technologies used to maintain ski trails, increased efforts to attract new skiers, and an increase in the portion of trails dedicated to novice skiers, the Vermont court refused to decide whether defendant owed a duty as a matter of law. Instead, it thought the question of whether the danger was obvious, necessary, and inherent was one properly determined by a jury.

_____

undoubtedly a risk inherent in the sport of skiing."); *Connelly v. Mammoth Mountain Ski Area*, 45 Cal. Rptr. 2d 855, 857 (Cal. Ct. App. 1995), *as modified* (Oct. 17, 1995) (holding that the inherent risks of skiing include "collisions . . . with properly marked or plainly visible snow-making or snow-grooming equipment") (internal quotation marks omitted).

*Dillworth*, 970 F.2d at 1118.

Plaintiff has proffered evidence that modern snowmaking technology includes portable snowmaking equipment, which Okemo owns and could have used on the trail in question. Plaintiff has further proffered evidence that Defendants could have relocated the snowmaking equipment with which he collided so that no collision was possible. Testimony from Okemo employee and ski safety expert Mark Petrozzi that the snowmaking gun Plaintiff collided with is "not trail side" (Doc. 96-2 at 3) renders it a jury question whether it is a risk inherent to skiing to encounter a fixed snowmaking station in the middle of a beginner trail.

Although snowmaking may be integral to the operation of ski resorts, in the light most favorable to Plaintiff, a jury could reasonably conclude that the risk of colliding with snowmaking equipment in the middle of a beginner ski trail was "reasonably avoidable" by relocating the equipment elsewhere or replacing it with portable snowmaking and thus was not an obvious and necessary danger inherent to the sport. *See Eipp v. Jiminy Peak, Inc.*, 154 F. Supp. 2d 110, 116 (D. Mass. 2001) (observing that where plaintiff collided with a snow gun in the midst of an expert trail, summary judgment was not available for the ski resort because although "inherent risks" constitute "all natural conditions beyond the control of the ski area operators or the skier[,] [t]he presence of a snowgun in the middle of a ski trail does not appear to fall into this category") (internal quotation marks omitted).

Plaintiff has further established a genuine issue of fact as to whether the snowmaking station was properly padded. *See Erickson v. The Stratton Corp.*, No. 5:11-cv-00051, Doc. 102 at 7, 8 (D. Vt. May 13, 2013) (allowing jury to decide whether ski resort failed to properly pad a snowmaking hydrant with which plaintiff collided).

Because the court cannot determine as a matter of law that the snowmaking equipment's position and padding in this case was an obvious and necessary danger of skiing, Defendants' request for summary judgment under 12 V.S.A. § 1037 is DENIED.

### 3.   Whether Defendants Breached Their Duty to Plaintiff.

If colliding with a snowmaking gun on a beginner trail was not an obvious and

necessary danger of skiing, Defendants owed Plaintiff a duty "to keep [their] premises reasonably safe." *Dalury v. S-K-I, Ltd.*, 670 A.2d 795, 799 (Vt. 1995) ("[A] ski area owes its customers the same duty as any other business—to keep its premises reasonably safe."). Whether a defendant's conduct breaches its duty to the plaintiff is ordinarily a question for the jury. *See LeClair v. LeClair*, 2017 VT 34, ¶ 16, 204 Vt. 422, 433, 169 A.3d 743, 750 (2017) ("It is for the jury as factfinder, not this Court, to determine whether defendant breached a duty to prevent plaintiff from being injured by a dangerous condition on the property that defendant should have anticipated plaintiff would encounter.").

Defendants argue that they did not breach any duty owed to Plaintiff as a matter of law because no reasonable jury could find that Okemo's placement of its snowmaking equipment was unreasonable or that a gap existed between the snowmaking padding and the snow that allowed Plaintiff to strike an unprotected metal pole.

With regard to the reasonableness of the placement of Okemo's snowmaking equipment, Plaintiff cites evidence that Defendants were aware that beginner skiers frequently fell on the Open Slope and Lower Mountain Road trails. He also cites Defendants' admissions that it would have been possible to remove the snowmaking equipment from that area and move it trail side or replace it with portable snowmaking equipment.

In support of his allegations that the snowmaking equipment was improperly padded, Plaintiff cites testimony from two of Defendants' employees that snowmaking gun padding must be flush with the snow surface to prevent skiers from sliding under it and coming in contact with snowmaking equipment. In addition to his own deposition testimony that he slid "into a metal pole or a steel pole" (Doc. 89-4 at 31), he proffers testimony from others that he was lying against the pole and that a skier cannot hit the metal portion of snowmaking equipment when Gilman TS-2 padding is properly installed.

Although Plaintiff lacks evidence of the precise manner of his collision, the evidence is not "so replete with inconsistencies and improbabilities that no reasonable

15

juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (internal quotation marks omitted). "[C]ircumstantial evidence may be . . . sufficient to raise a genuine issue of material fact precluding the grant of summary judgment." *Gayle v. Gonyea*, 313 F.3d 677, 684 (2d Cir. 2002). Moreover, under Vermont law, the reasonableness of a defendant's actions is generally a question for the jury. *See State Farm Mut. Auto. Ins. Co. v. Colby*, 2013 VT 80, ¶ 32, 194 Vt. 532, 545, 82 A.3d 1174, 1184 (2013) ("The question of reasonableness is ordinarily for the factfinder.").

Viewing the facts in the light most favorable to Plaintiff, a jury could reasonably find that Defendants breached their duty to Plaintiff by improperly placing and padding the snowmaking equipment with which he collided. *See Peresypa v. Jiminy Peak Mountain Resort, Inc.*, 653 F. Supp. 2d 131, 140 (D. Mass. 2009) ("As there are factual questions regarding the actual location of the snow gun in relation to the skiable area of the trail and whether it was adequately marked and padded, Defendant's motion for summary judgment will be denied as to this claim."). Because a genuine dispute of material fact exists regarding whether Defendants breached their duty of care, summary judgment is inappropriate.

### 4.    Whether Defendants' Breach Caused Plaintiff's Injuries.

Under Vermont law,

> causation requires both "but-for" and proximate causation. Thus, the plaintiff must first show that the harm would not have occurred "but for" the defendant's conduct such that the "tortious conduct [was] a necessary condition for the occurrence of the plaintiff's harm." The plaintiff must also show that the defendant's negligence was "legally sufficient to result in liability," such that "liability attaches for all the injurious consequences that flow [from the defendant's negligence] until diverted by the intervention of some efficient cause that makes the injury its own." Although proximate cause "ordinarily" is characterized as "a jury issue," it may be decided as a matter of law where "the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way."

*Collins v. Thomas*, 2007 VT 92, ¶ 8, 182 Vt. 250, 253-54, 938 A.2d 1208, 1211 (internal

citations omitted) (alterations in original).

Defendants argue that Plaintiff cannot establish causation because he fails to proffer any admissible evidence from which a jury could conclude that his injuries would have been less severe had he hit the padding and not a metal pole. As Defendants point out, Dr. Scher opines that Plaintiff was skiing at a speed that rendered his injuries inevitable. How fast Plaintiff was skiing, whether Plaintiff struck the snowmaking equipment's padding or pole, and whether he was comparatively negligent are all contested issues of fact that must be decided by the jury. Plaintiff need not rule out every possible cause of his injuries in order to present them to a jury. *See Ahmad v. E. Ramapo Cent. Sch. Dist.*, 2013 WL 12446244, at *2 (S.D.N.Y. Aug. 15, 2013) ("I cannot as a matter of law rule out the possibility that the jury could reject all of [d]efendant's stated reasons and accept [p]laintiff's argument that retaliation was the sole reason for his termination.").

Even if a jury concludes that Plaintiff would have suffered the same injuries had the snowmaking station been properly padded, it remains undisputed that the snowmaking equipment could have been located elsewhere. The alleged "tortious conduct" of placing the snowmaking equipment in the middle of a beginner ski trail was a "necessary condition for the occurrence of . . . [P]laintiff's harm[,]" giving rise to a genuine dispute of material fact regarding causation. *Collins*, 2007 VT 92, ¶ 8, 182 Vt. at 253-54, 938 A.2d at 1211; *see also Dodge v. McArthur,* 223 A.2d 453, 455 (Vt. 1966) ("[I]f the initial negligence creates a situation making it likely that some other force or action will occur and bring about harm, responsibility remains with the original actor."). "[A] showing of cause-in-fact almost always involves circumstantial evidence" and "the greater the risk that the defendant's conduct will result in the harm the plaintiff suffered, the more likely that a jury will be allowed to find that such conduct was the cause of that harm." *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48-49 (2d Cir. 2015).

For similar reasons, the question of foreseeability cannot be resolved as a matter of law. "Proximate cause is the law's method of keeping the scope of liability for a defendant's negligence from extending by ever-expanding causal links." *Est. of Sumner*

17

*v. Dep't of Soc. & Rehab. Servs.*, 649 A.2d 1034, 1036 (Vt. 1994). A jury could reasonably find that Defendants' placement and padding of the snowmaking equipment was a foreseeable risk of the harm Plaintiff suffered. *Cf. Collins*, 2007 VT 92, ¶ 10, 182 Vt. at 255, 938 A.2d at 1212 (holding the "defendant's conduct was not the proximate cause of plaintiff's injury, because there was no relationship between the defects and the accident"). As the Second Circuit has explained, Plaintiff need not negate all alternative causation mechanisms in order to survive summary judgment:

> [W]hen a party's negligence increased the likelihood of an accident occurring, a jury could find that the negligence caused the harm, even in the absence of more direct evidence indicating causation. Proffering evidence negating causation then becomes the responsibility of the party that seeks to deny the effect of its negligence. And today, circumstantial connections between a defendant's negligence and the harm that occurred have been deemed enough to raise a question for the jury[.]

*Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 676-77 (2d Cir. 2016) (internal citations omitted).

Because the evidence is not "so clear that reasonable minds cannot draw different conclusions[,]" summary judgment must be denied. *Collins*, 2007 VT 92, ¶ 8, 182 Vt. at 254, 938 A.2d at 1211 (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 89) is DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 30th day of June, 2023.

Christina Reiss, District Judge
United States District Court